* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Rowell with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. That all parties are properly before the Industrial Commission, and that the Industrial Commission has jurisdiction of the parties and of the subject matter; *Page 2 
2. That all parties are subject to and bound by the North Carolina Workers' Compensation Act;
3. That all parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties;
4. That the TPA on the risk for defendant in this claim was Gallagher Bassett;
5. That plaintiff sustained an admittedly compensable injury on January 20, 2004 arising out of and in the course and scope of her employment and the same was admitted on a Form 60;
6. That an employment relationship existed between the employee and employer on January 20, 2004;
7. That the employee's average weekly wage is $498.15, yielding a compensation rate of $332.11;
8. That plaintiff filed a Form 33 Request for Hearing on July 18, 2007 citing that "Plaintiff cannot perform the job that she has been offered by employer-defendant because it is not suitable employment";
9. That defendants filed a Form 33R on July 20, 2007 citing that "Defendants contend plaintiff refused a suitable real job that was approved by her treating physician and no Form 28U was filed";
10. That mediation was held and impassed on November 7, 2007.
11. The parties stipulated in evidence as Stipulated Exhibit # 1, Pre-Trial Agreement, as modified and initialed by the parties.
12. The parties stipulated in evidence as Stipulated Exhibit # 2, Index/Summary of Medical Records and the medical records, NCIC Forms and vocational records. *Page 3 
13. The parties stipulated in evidence as Stipulated Exhibit # 3, defendants' responses to plaintiff's discovery
14. The parties stipulated in evidence as Stipulated Exhibit # 4, Personnel records
15. The parties stipulated in evidence as Stipulated Exhibit # 5, Job description for boar stud operator
16. The parties stipulated in evidence as Stipulated Exhibit # 6, Time cards
17. The parties stipulated in evidence as Stipulated Exhibit # 7, Pay records
 PLAINTIFF'S EXHIBITS
1. List of tasks from Katherine Becton to plaintiff
2. List of duties prepared by plaintiff
3. Photographs (5 pages of photocopies)
 DEFENDANTS' EXHIBITS
1. Photographs (7)
 * * * * * * * * * * *
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the Deputy Commissioner, plaintiff was fifty-two years old with a birth date of April 14, 1955.
2. Plaintiff completed the eighth grade in school, but she later obtained her GED in 2005.
3. Plaintiff was first employed by employer-defendant on November 18, 1996 as a nursery supervisor/finishing manager at its Anson County hog farm. *Page 4 
4. Plaintiff later began working as a boar stud operator. This was her job when she was injured.
5. The boar stud operator collects semen from boars and processes it in the lab. The collection process involves taking the boars out and around to go into pens. The boar is familiar with the path and the operator's job is to keep the boar calm and not to go so fast that it scares the boar.
6. The boars weigh anywhere from 300 to 700 pounds, and the collection process involves the boars mounting two metal dummy sows. The boar stud operator teaches the boars to mount the dummies over time.
7. When the boar mounts the dummy, the boar stud operator takes hold of the boar's penis and collects the ejaculate in a cup. This can take anywhere from five to thirty minutes, but it usually takes fifteen to twenty minutes.
8. The operator usually squats and sits on a bucket on the left side of the boar. If her dominant right hand gets tired, she goes on the other side and uses her non-dominant left hand.
9. The boar stud operator's job also encompasses the lab work. Katherine Benton, Plaintiff's co-worker, testified and the Commission finds that as a boar stud operator, she works forty-five to fifty-five hours per week. As a part of this job, she usually works about fifteen to twenty of those hours in the lab.
10. Mrs. Benton stands most of the time when she is in the lab, but she can do eight-five percent of her tasks in the lab sitting down. Mrs. Benton testified that most people do the lab work standing because it takes less time to do the work when standing. The lack of counter space makes it difficult to process sitting, and it is difficult to reach and get supplies when sitting. Prior to her injury, plaintiff also performed this job. *Page 5 
11. On January 20, 2004, plaintiff was corralling pigs weighing approximately 300 pounds onto a truck with a herding board when the pigs became spooked and ran toward plaintiff. The pigs struck her herding board and caused plaintiff to twist suddenly to the right, injuring her back, right hip and groin. Plaintiff felt immediate pain, but she finished out her workday.
12. The next day, January 21, 2004, she reported to Stanly Memorial Hospital with excruciating pain, a level nine out of ten, in her back, hip and right groin. Plaintiff was examined by Kenneth D. Shank, D.O. who diagnosed her as having a back sprain and wrote her totally out of work.
13. Plaintiff returned to work on January 29, 2004 with restrictions including no lifting over twenty-five pounds, no pushing or pulling over twenty-five pounds, and alternating sitting and standing as necessary. Plaintiff attempted to work under these restrictions, but she reported that she was unable to do so as a manager because employer-defendant was too short-handed.
14. On February 4, 2004, plaintiff underwent a sacroiliac ("SI") injection at Norwood Medical Services, as conservative and manipulative treatment had not mitigated her persistent SI pain. This injection alleviated some of the point tenderness on her SI joint. Dr. Shank also referred her to physical therapy.
15. Plaintiff followed up with Dr. Shank on March 1, 2004 with complaints of continued pain. Dr. Shank noted that plaintiff's pain had not lessened with physical therapy, and plaintiff's pain seemed to worsen after a session such that she was now experiencing a prickling sensation in the upper quadrant of her buttocks.
16. Plaintiff returned to Stanly Memorial Hospital on March 29, 2004 with pain in her right buttocks that radiated to the right groin and medial thigh; she was assessed with lumbar *Page 6 
strain/sprain and radiation to sciatic nerve and was released from work for at least thirty days as her injuries would not heal without completely resting the muscles.
17. Plaintiff was referred by Dr. Shank to Joseph Zucker, M.D. and began treating with Dr. Zucker on April 30, 2004. After examining her, Dr. Zucker fitted plaintiff with a lumbosacral brace, advised that she continue on her regiment of pain medications and instructed her to begin attending physical therapy three times a week.
18. After three weeks of physical therapy, on May 21, 2004, plaintiff returned to Dr. Zucker and reported that instead of improving her pain, she believed that it was aggravating the pain in her back and right buttock and groin area. On this same date, Dr. Zucker released plaintiff to return to sedentary work.
19. Plaintiff began treating with Daniel Murrey, M.D. at OrthoCarolina on July 22, 2004. Her pain was still rated as a seven out of ten with a constant aching and burning sensation that radiated from the bilateral low back into the buttocks and wrapped around into the right groin and medial thigh, with the groin and thigh pain being the most severe. Her pain worsened with standing, walking, lifting, sitting or bending, but it did improve with rest.
20. Dr. Murrey ordered an MRI but noted that plaintiff may simply have a soft tissue injury that would not show up on an MRI. The MRI was taken on August 4, 2004, which showed small bilateral hip joint effusions.
21. On August 2, 2004, plaintiff attended another physical therapy session at Stanly Memorial Hospital. At this session, plaintiff reported that icing helped her pain, but only for short periods of time. She stated that her pain radiated down her leg and continued to the mid-thigh and groin and stayed constant at a rating of between four to nine out of ten. Plaintiff also noted that her groin pain could be intense enough at times as to feel like labor pains. *Page 7 
22. On August 24, 2004, plaintiff returned to Dr. Murrey for a follow up appointment. At this time, Dr. Murrey determined that she was not getting better with therapy and released plaintiff to resume her regular job at four hours a day and to increase it by two hours a day per week until she gets back to full duty. He also noted that if plaintiff could not perform her regular work, she would need a Functional Capacity Evaluation ("FCE").
23. Plaintiff had the recommended FCE, and on October 5, 2004, Dr. Murrey reviewed plaintiff's FCE and indicated that plaintiff had reached maximum medical improvement ("MMI") from an orthopedic standpoint. He also recommended releasing her for light duty work with restrictions according to her FCE. These restrictions included occasional lifting up to twenty pounds and repetitive lifting up to ten pounds, walking and carrying up to ten pounds at a slow pace, overhead lifting limited to ten pounds but floor to shoulder lifting twenty pounds, and limiting kneeling or squatting to two minutes at a time.
24. On October 5, 2004, Dr. Murrey issued plaintiff a 5% impairment rating to the back.
25. Plaintiff returned to Dr. Murrey on December 2, 2004 with the same complaints of pain that she had previously reported — leg, pelvic and right groin pain that wrapped from the iliac crest region to the groin. Although these symptoms were the same, plaintiff felt that they were worsening with time.
26. Dr. Murrey's impression was right hip and groin pain of unclear etiology. He did not feel that her complaints were coming from her spine, so he referred her for a hip evaluation with J. Bohannon Mason, M.D., who concluded that plaintiff's pain was most likely radicular in nature. Both Dr. Mason and Dr. Murrey suggested plaintiff seek pain management.
27. Plaintiff continued working for employer-defendant in a light duty capacity until February 2005, when she ceased work due to the lack of permanent light duty work available within *Page 8 
her restrictions. Plaintiff went out of work at this time, and defendants began paying her benefits under N.C. Gen. Stat. § 97-29.
28. Plaintiff began Vocational Rehabilitation in May 2005 and enrolled in a GED program at South Piedmont Community College where she obtained her GED in 2005.
29. Plaintiff also looked for alternate employment during this time. Plaintiff put in applications for jobs at factories and plants, but she could not find work.
30. On August 5, 2005, plaintiff began seeing Ade Akande, M.D. at Charlotte Pain Associates, P.A. for her continued pain. Dr. Akande's impression was primary right side and lower back pain originating from the facet joint, right SI joint and right hip joint, in addition to referred pain from the lower back to the right groin and right thigh. He recommended right-sided facet and SI joint injections, as well as an injection into the right hip. However, plaintiff had no significant benefit from the first set of injections, which was uncommon.
31. Dr. Akande reevaluated her on August 22, 2005, and she still had the same symptoms consistent with the conditions described above. As a result, Dr. Akande requested an MRI, and this was performed on September 9, 2005.
32. The MRI revealed a disc bulge at L3-4 with mild right foraminal narrowing and facet joint arthropathy (swelling). At L4-5 and L5-S1, there was an annular disc bulge with additional facet joint arthropathy, which is also arthritis, and a mild narrowing affecting the L5 nerve root. Plaintiff's condition does not require surgery.
33. Dr. Akande testified, and the Commission finds, that the MRI helped Dr. Akande confirm his suspicion for facet joint arthropathy. It also revealed mild neural foraminal narrowing and disc bulges that may be responsible for the other symptoms that she presented with, mainly the radiation of pain down the right thigh, groin and into the leg. *Page 9 
34. Based on the MRI, Dr. Akande recommended right-sided nerve blocks, Celebrex and Duragesic patches. However, plaintiff did not have significant pain relief from any of this treatment, though she did have some lessening of her pain from her initial visit with the Duragesic patch.
35. Dr. Murrey next saw plaintiff on June 20, 2006. He obtained new x-rays of her back that revealed no degeneration and no hip pathology. His impression was chronic soft tissue strain in the right pelvis and groin. Dr. Murrey did not feel that there had been any changes in her exam or her x-rays, and he did not have anything further to offer her. He did not change her rating or her work restrictions.
36. Dr. Akande saw plaintiff again and, due to lack of improvement from any interventional procedure which is unusual, made a referral to a pain psychologist to help her deal with coping skills and behavior modification to help her deal with her pain better. There is no evidence that defendants arranged for this treatment for plaintiff.
37. In July 2006 plaintiff informed Dr. Akande that she was having trouble finding work because her pain would not allow her to drive the hour to Charlotte, so she was forced to continue looking primarily in Anson or Union Counties.
38. In the fall of 2006, employer-defendant approved a job offer for plaintiff to work in the lab at the Anson County plant performing lab work that required some periods of standing.
39. On October 9, 2006 Dr. Murrey received a description of a lab tech position to review. He felt that plaintiff was physically capable of performing the activities outlined in the description. *Page 10 
40. Plaintiff returned to work to attempt to perform this job in November 2006. When she began this job, plaintiff's pain was controlled at a rate of between three and five out of ten.
41. On December 4, 2006, plaintiff fell over a stool at work and suffered a hip contusion. Dr. Akande examined her on January 22, 2007 and found residual pain at the contusion site, along with tenderness around the lower facet and SI area and hip joint.
42. Dr. Akande obtained another MRI, which was very similar to her prior MRI. Dr. Akande felt, and the Commission finds, that the December 2006 fall caused a flare-up of her previous condition. Plaintiff was out of work for this fall from December 4, 2006 through March 14, 2007, when she returned to work.
43. Thereafter, Plaintiff reported to Dr. Akande that she experienced increased pain from standing more than an hour at a time at her job and had since modified her job responsibilities to accommodate her radicular pain. Dr. Akande issued at plaintiff's attorney's request restrictions on April 17, 2007 limiting her to a sedentary job that minimizes standing or walking as prolonged or intermediate standing or walking severely increases her pain.
44. When plaintiff returned to Dr. Akande on May 14, 2007, she reported that her pain had decreased again to about a four or five out of ten.
45. In the summer of 2007, plaintiff reported to Dr. Akande that she had stopped working as a lab technician for employer-defendant because they did not follow her restriction schedule and she could not tolerate the standing and other activities which they expected her to perform. Plaintiff was still out of work and treating with Dr. Akande as of the date of the hearing before the Deputy Commissioner. *Page 11 
46. Plaintiff's co-worker, Katherine Benton, was out on medical leave for an extended period of time from September 2006 through March 23, 2007. When Mrs. Benton returned to work, she saw plaintiff cry practically every week, and plaintiff said she was in a lot of pain. Based on her observations, Mrs. Benton felt that plaintiff was in pain. Plaintiff told her that she needed to sit down because of the pain. She would be on her feet about ten to fifteen minutes, and then she would sit again. Plaintiff was usually at work only two to four hours each day as she went home early practically every day.
47. Plaintiff called Don Case and told him that she could not do the job any longer because her pain was so bad; Mr. Case fired her. Then Angie Romaine called plaintiff in the office again and said that plaintiff had been fired. Ms. Romaine later called plaintiff again and told plaintiff to come back to work, but plaintiff did not go back because she could not do this job due to her pain. Plaintiff's last day of work was July 3, 2007. She has been out of work since that time.
48. The lab job that employer-defendant offered plaintiff involved walking and standing. Plaintiff stands on her left leg because it hurts to put pressure on her right leg. Employer-Defendant provided plaintiff with a stool when she did this job, but many parts of the job could not be done sitting.
49. Plaintiff was able to leave work when her pain became too great while she was performing the lab work position.
50. Normally, employer-defendant arranged the boar stud work as a two-person job. When Mrs. Benton returned from her medical leave, there were three people including plaintiff doing this position. The boar stud position that employer-defendant offered plaintiff was never separate from the lab position that employer-defendant offered her after her injury. *Page 12 
51. Prior to her accident, plaintiff was able to perform her regular job but after her accident, plaintiff has been unable to perform her regular job. As a result, plaintiff gets depressed. It bothers her that she cannot do the things that she was able to do before her accident.
52. Plaintiff did not know of employees who were able to leave when their pain became too bad or to only work four hours per day, other than she. She has been with employer-defendant for eight years and has never seen the boar stud operated that way. Employer-Defendant has a strict attendance policy, and employees cannot be tardy more than three times or they will be written up.
53. Don Case, Safety Manager for employer-defendant, called plaintiff to do the lab work in the fall of 2006 because Mrs. Benton was ill and was unable to work. He needed someone who knew the work and could help them out at the top of the pyramid. Plaintiff tried to do the lab work, but she complained that the standing was too much, so he had vocational rehabilitation provide some accommodations.
54. Mr. Case testified that only one other employee had ever worked solely in the lab before. This employee was afraid of boars and was simply training in each department as part of an internship for a manager-trainee program. He has not ever hired anyone only to do the lab work. After plaintiff's last day of work on July 3, 2007, employer-defendant did not hire anyone to take her place.
55. Overall, Dr. Murrey thinks that plaintiff is having pain, but she is not coping with it very well. He could have reached the opinion that plaintiff was just a malingerer, but based on all of the evidence, his impression was that while her symptoms were unusual and he could not find a source for her pain, she did seem to be experiencing pain of some sort and was not able to cope with *Page 13 
it. Pain has a physical and a psychological component, and people vary in how much pain they can tolerate and how well they can overlook the pain and continue to function.
56. The evidence that Dr. Murrey has to link her complaints with her compensable accident was the fact that she told him that she did not have these problems prior to the accident and that she did have them consistently afterward. In response to a hypothetical from plaintiff's counsel on plaintiff's job duties, he testified that she did not have the ability to do those types of activities when she did her FCE. Based on this change in her ability to function, he testified that she had some change in status that occurred at the time of her injury. Given this information, he felt that the accident was the most probable cause or precipitating event to setting plaintiff's pain in motion.
57. Overall, Dr. Akande felt that plaintiff's condition at the time of his deposition was the same as it was when he initially saw her in August 2005, no better and no worse. He would have encouraged her to go back to work, to try and do as much as she can. Dr. Akande recommended that plaintiff have a pain psychologist evaluate her to help her with her coping skills, modify her behavior and treat her depression.
58. Dr. Akande testified that the injury probably resulted in the MRI findings that in turn resulted in a discomfort that plaintiff described, and the persistence of that discomfort has prevented her from going back to the level of functioning that she had prior to the accident.
59. Dr. Akande had always felt that plaintiff could physically perform a sedentary job. Plaintiff went out of work on her own because her pain became too great when performing the work in the lab. After a few months out of work, her pain was mild to moderate.
60. Dr. Akande recommended that plaintiff see Mary Foucette with Presbyterian Rehab Center as a pain psychologist. Given the history that plaintiff has been out of work for a couple of years, Dr. Akande testified that the forecast for her being able to return to work is not very good. *Page 14 
He felt that there was interplay between plaintiff's physical pain, her pain perception and her psychological make-up that needs to be evaluated in a formal setting. In his experience, the psychological factors can be more of a significant factor in the ability of people to return to any kind of work than the physical factors. He did not feel that it would be possible to have a full and fair understanding of her ability to work without having the psychological component developed.
61. As of the date of the hearing before the Deputy Commissioner, plaintiff was only treating with Dr. Akande. She had not seen Dr. Murrey in over a year because he had indicated that he did not have anything else to offer her.
62. On April 16, 2007, defendant filed an I.C. Form 28T Notice of Termination of Compensation by Reason of Trial Return to Work (Form 28T), pursuant to N.C. Gen. Stat. §§ 97-18.1 (b) and 97-32.1. The Form 28T stated that plaintiff returned to work for employer-defendant on March 14, 2007. On March 14, 2007, plaintiff did in fact return to work at reduced hours and modified duties. Defendants properly filed the Form 28T to reflect the trial return to work and properly terminated temporary total disability compensation as of the date the plaintiff returned to work.
63. Plaintiff's trial return to work began on March 14, 2007 and continued until July 3, 2007, when she was fired by employer-defendant, when she reported to employer-defendant that she was unable to continue working her job due to her pain.
64. It is determined based upon a review of the evidence that during the period of time of plaintiff's trial return to work, she was unable to perform this job successfully. This review supports that plaintiff left work early often due to her pain at work, that she had been observed crying at work, appeared to be in pain at work, often worked less than four hours a day, and was unable to perform the duties of her job. *Page 15 
65. Defendant properly terminated plaintiff's total temporary disability compensation on March 14, 2007, pursuant to N.C. Gen. Stat. §§ 97-18.1(b) 97-32.1, by the filing of its Form 28T. At the time of filing the Form 28T, N.C. Gen. Stat. § 97-18.1(b) read in pertinent part as follows:
 (b) an employer may terminate payment of compensation for total disability being paid pursuant to N.C. Gen. Stat. § 97-29 when the employee has returned to work for the same or a different employer, subject to the provision of N.C.G.S. § 97-32.1 . . . (Emphasis added). At the time of filing the F28T, N.C.G.S. § 97-32.1 read in pertinent part as follows: . . . If the trial return to work is unsuccessful the employee's right to continuing compensation under N.C.G.S § 97-29 shall be unimpaired unless terminated or suspended thereafter pursuant to the provisions of this Article. (Emphasis added).
66. A clear reading of N.C. Gen. Stat. § 97-18.1(b) requires that at the filing of the F28T if the employee has returned to work and is working, and then defendant may terminate plaintiff's total temporary disability compensation, but only subject to N.C. Gen. Stat. § 97-32.1. A clear reading of N.C. Gen. Stat. § 97-32.1 requires that if the trial return to work is unsuccessful, then the employee's right to continuing compensation shall be unimpaired unless then terminated or suspended upon the filing of a Form 24 and approval given by the Commission.
67. It is determined that after attempting a trial return to work, on July 3, 2007 the plaintiff went out of work. It is found that plaintiff has carried her burden to show that the trial return to work was unsuccessful due to the compensable injury. Therefore, defendants owe plaintiff temporary total disability compensation from July 3. 2007 and continuing.
 * * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW *Page 16 
1. Plaintiff sustained a compensable injury by accident at work on January 20, 2004, resulting in injuries to her low back, right hip and groin. N.C. Gen. Stat. § 97-2(6) (2008).
2. Plaintiff attempted a trial return to work on March 14, 2007 which was unsuccessful as of July 3, 2007. N.C. Gen. Stat. § 97.32.1.
3. Plaintiff carried the burden of showing that the trial return to work was unsuccessful due to the compensable injury and that plaintiff is entitled to temporary total disability compensation from July 3, 2007 and continuing. N.C. Gen. Stat. §§ 97-29 and 97-32.1.
4. Plaintiff is entitled to have defendant provide all medical reasonable and necessary treatment resulting from her January 20, 2004 compensable injury, including treatment with Mary Foucette, a pain psychologist. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-27.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees hereinafter approved, defendant shall pay temporary total disability compensation to plaintiff at the stipulated compensation per week from July 3, 2007 and continuing until the plaintiff returns to work or until further Order by the Commission.
2. Such compensation as is presently owed and due to plaintiff under paragraph 1 of this Award shall be paid in a lump sum without commutation, and such temporary total disability compensation due plaintiff from July 3, 2007 is subject to attorney's fees approved herein.
3. A reasonable attorney fee of twenty-five percent (25%) of the compensation due plaintiff under paragraph 1 of this award is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent (25%) of the lump sum due plaintiff under paragraph 1 of this *Page 17 
award which has accrued to date shall be paid directly to plaintiff's counsel and shall be deducted from the compensation due plaintiff.
4. Dr. Akande is hereby appointed as plaintiff's authorized treating physician.
5. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of compensable injuries for as long as such examinations, evaluations and treatment may reasonably be required to effect a cure, provide relief or tend to lessen the period of disability, when bills for the same have been approved in accordance with the provisions of the Act, including evaluation and treatment with Mary Foucette, a pain psychologist.
6. Defendant shall pay the costs.
This the9th day of June 2009.
 S/___________________
 DIANNE C. SELLERS
 COMMISSIONER
CONCURRING:
S/___________________ PAMELA YOUNG CHAIR
S/___________________ BERNADINE BALLANCE COMMISSIONER *Page 1